IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| CHARLIE GORDON EPLEY, | : | |
|---|---|---|
| | : | Civil Action No. 1:18-cv-111 |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | JURY DEMAND |
| WALGREEN COMPANY, | : | |
| | : | |
| *Defendant.* | : | |

# COMPLAINT

Plaintiff, Charlie Gordon Epley ("Plaintiff"), through his attorneys, Grant, Konvalinka & Harrison, P.C., hereby files this Complaint against Walgreen Company ("Walgreen's" or "Defendant") for unlawful employment actions pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §621, *et seq.*; the Tennessee Disability Act ("TDA"), Tenn. Code Ann.§8-50-103; and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. §4-21-101, *et seq.* As grounds for this Complaint, Plaintiff avers, as follows:

## I. JURISDICTION

1. This Court has subject matter jurisdiction over Plaintiff's ADA and ADEA claims pursuant to 28 U.S.C. § 1331, as there is diversity of citizenship between the parties, and the amount in controversy exceeds the threshold amount.

2. This Court also has subject matter jurisdiction over Plaintiff's ADA and ADEA claims pursuant to 28 U.S.C. § 1332, because those claims present federal questions.

3. The Court has supplemental jurisdiction over Plaintiff's TDA and THRA claims pursuant to the federal supplemental jurisdiction statute at 28 U.S.C. §1367.

4. The actions which gave rise to this Complaint all occurred in and around Knoxville, Knox County, Tennessee, and other counties in East Tennessee, making venue proper in this District pursuant to 28 U.S.C. §1391.

## II. PARTIES

5. Plaintiff is a resident of Knoxville, Knox County, Tennessee. Plaintiff was employed as a pharmacist by Defendant since September 18, 1990, most often working in Knoxville, TN, and in surrounding counties. At all times relevant to the events in the Complaint, Plaintiff was over forty years of age.

6. Defendant is a very large drug store chain with thousands of employees and locations throughout the country, including in Knoxville, Knox County, Tennessee. Its corporate headquarters are in Deerfield, Illinois, and it is authorized to do business in the State of Tennessee. It may be served with process through its agent of record, The Prentice-Hall Corporation System, Inc., 2908 Poston Avenue, Nashville, TN 37203-1312.

7. Defendant is an "employer," as that term is defined by Tenn. Code Ann. §§ 4-21-102(5) and 8-50-103(b), subjecting Defendant to the provisions contained in the ADA, the ADEA, the TDA and the THRA.

## III. FACTS

8. Plaintiff was hired by Defendant on September 18, 1990, and he worked until his unlawful termination or "forced retirement" by Defendant on or about May 15, 2017.

9. At the time of his termination or "forced retirement," Plaintiff worked as a "floater" or "market pharmacist," meaning he worked in different locations and on different schedules, including weekends. Plaintiff considered his "home store" location to be the store on Western Avenue, in Knoxville, Tennessee.

10. Due to some of Plaintiff's health conditions, of which Defendant's management was aware, Plaintiff had cut back on the hours he worked from 40 per week to only 32 per week during the last four years he was employed by Defendant.

11. Despite Plaintiff's medical condition, he not only worked in his home store in Knoxville, but Plaintiff also sometimes drove significant distances to work in other locations for Defendant.

12. Plaintiffs health issues did impact his ability to arrive at work at exactly the scheduled time, but usually only a few minutes, and Plaintiff never failed to notify Defendant if his health issues caused him to miss any work or if he would be more than 5-10 minutes late arriving for his scheduled shift.

13. Sloane Cleveland ("Ms. Cleveland"), a young woman under the age of 40 years of age, became the new pharmacy manager of the Western Avenue store in about 2013.

14. Ms. Cleveland made no secret of her close friendships with the younger pharmacists, some of the young pharmacy techs, and pharmacy-student interns, and Ms. Cleveland often socialized with the interns and hired them to do private work for her.

15. Ms. Cleveland also stated openly that she wanted to replace the "old guy" and hire newly-graduated, younger pharmacists, including her pharmacy-intern friends. Multiple times,

- 3 -
Case 1:18-cv-00111-PLR-CHS   Document 1   Filed 05/25/18   Page 3 of 15   PageID #: 3

both in front of other employees and in private, Ms. Cleveland asked Plaintiff when he was going to retire and asked another pharmacist, also over 40, when she planned to retire.

16. In late 2016, Ms. Cleveland began to routinely refer to Plaintiff's "disabilities" when talking with him, including when having conversations in front of other workers.

17. Ms. Cleveland also criticized Plaintiff, saying he "used non-nurturing words," even though she often used profanity when talking to staff.

18. In October 2016, Plaintiff was given an "above average" rating by Ms. Cleveland on his performance evaluation.

19. Shortly afterward, however, Ms. Cleveland resumed her criticisms of Plaintiff and accused Plaintiff of having said he "wanted customers to die."

20. Plaintiff explained that he had never said that, that he had told one of the young pharmacy techs to slow down and stop being careless, because an error in prescriptions could lead to mix-ups or even deaths.

21. Ms. Cleveland continued to make false accusations against Plaintiff and wrote him up for "being late," even though Plaintiff had notified the scheduler of a health issue on the day in question.

22. Ms. Cleveland continued finding fault with Plaintiff's job performance, claiming Plaintiff had been late for work, and criticizing Plaintiff for his "total incompetence," because he gave a TennCare customer a 30-day prescription, rather than a 90-day prescription.

23. Plaintiff told Ms. Cleveland that when he was late, it was because of unexpected health complications related to his medical conditions. He notified the scheduler for Walgreen's if he would be more than a little late. Plaintiff also informed Ms. Cleveland that, a few times,

when the scheduler notified him that he was to report to work as a floater at a store, that store was too far away from him to arrive for work on time, but he told the scheduler that he would be late, because of the distance Walgreen's was requiring him to drive for work.

24. Plaintiff told Ms. Cleveland that he remembered the incident with the TennCare patient and knew the patient should have been given an additional 60 days' medication, but that he did not discover the error until after the patient had left the pharmacy.

25. Plaintiff told Ms. Cleveland that he wrote a note to explain the patient was owed another 60 days' medication and posted it in the pharmacy so that other pharmacists would be aware.

26. Ms. Cleveland told Plaintiff that the pharmacist alone was responsible for all medications and that Walgreen's was not responsible if the store was short-staffed or had unqualified techs working there.

27. Ms. Cleveland also claimed Plaintiff had been "texting on the clock," "requiring overtime pay" and that his working over his scheduled hours causing the store to be "over pharmacy budget hours."

28. Plaintiff denied that he was texting during his work time, stating it was after his shift; but, inexplicably, Ms. Cleveland said she had "put [him] back on the clock," and that caused the pharmacy overtime budget to be exceeded.

29. Plaintiff was never paid overtime, unless Walgreen's requested that he work overtime, even when he had to stay beyond his assigned time to complete the work necessary to take care of customers until his replacement shift personnel arrived.

30. In October 2016, Ms. Cleveland gave Plaintiff paperwork related to Walgreen's disability and retirement benefits and told Plaintiff he needed to "strongly consider" which option he wanted to take. One of the young pharmacy-student interns who was close friends with Ms. Cleveland also asked Plaintiff when he was going to retire.

31. Plaintiff informed both Ms. Cleveland and the young tech that he did not wish to retire, since he was not of retirement age.

32. Plaintiff also told Ms. Cleveland that, although he did have serious health issues, if Walgreen's would attempt to work with him, there would be no need for him to leave because of his disabilities, since he was rarely late and rarely absent due to his health.

33. Plaintiff never requested information about early retirement or disability.

34. Thereafter, the criticisms and reprimands by Ms. Cleveland, store manager Michael Parker, or both, accelerated.

35. On Friday, April 21, 2017, when Plaintiff reported for his shift work at the Western Avenue store, Ms. Cleveland met him at the front of the store.

36. Ms. Cleveland told Plaintiff she needed to speak with him in the store manager's office. Michael Parker, the store manager, was present when Plaintiff went with Ms. Cleveland into the office.

37. Ms. Cleveland told Plaintiff that she thought he had been late for work once in February, then another time in March, and that he was also a few minutes late that day, April 21, 2017.

38. Ms. Cleveland claimed that Plaintiff had not notified Walgreen's when he was late, so his tardiness was unexcused.

39. Plaintiff disputed Ms. Cleveland's assertions and told her that he had always notified the scheduler if he had health issues that would require him to be more than 5-10 minutes late.

40. Ms. Cleveland told Plaintiff that she had talked to HR and the District Manager and she was approved to terminate Plaintiff's employment, unless he retired. Plaintiff was stunned and told Ms. Cleveland that he would need some time to think.

41. Ms. Cleveland told Plaintiff to leave the store. As he left, Plaintiff saw that Ms. Cleveland had apparently already called one of the young (under 40 years of age), fairly new pharmacists in to take Plaintiff's place.

42. The following Monday, April 24, 2017, Plaintiff called Scott Leslie ("Mr. Leslie"), the District Supervisor, to discuss the ultimatum given Plaintiff by Ms. Cleveland. Mr. Leslie would neither confirm nor deny what Ms. Cleveland had told Plaintiff, but Mr. Leslie told Plaintiff that he should call Walgreen's Human Resources ("HR"). Mr. Leslie gave Plaintiff a direct number for HR.

43. Plaintiff immediately called the HR number Mr. Leslie had given him. He spoke with a gentleman who identified himself as "Sean," and Plaintiff told Sean that he did not want to retire, since he was not yet retirement age, but that he should not be fired for his medical issues having made him late a few times.

44. Sean told Plaintiff that he was pulling Plaintiff's file. Sean told Plaintiff there was nothing in Plaintiff's file that indicated there was any plan to terminate Plaintiff's employment.

45. Plaintiff told Sean that he knew Ms. Cleveland had been writing him up for numerous alleged infractions; however, Sean said he was unaware of any such disciplinary issue.

46. Plaintiff asked for confirmation that there was nothing in his personnel file indicating he was to be fired, and Sean again confirmed there was nothing in the file which indicated Plaintiff's employment had been approved to be terminated.

47. Because of the discrepancies between what Ms. Cleveland had told Plaintiff and Plaintiff's personnel file, Sean told Plaintiff he would "kick it up to a supervisor" for further investigation.

48. Sean told Plaintiff to just continue working until the matter was resolved.

49. Plaintiff told Sean that he was not scheduled to work that week and that he was scheduled for vacation the following week.

50. Plaintiff told Sean that he would call back when his vacation was over.

51. Someone who identified themselves as an investigator called Plaintiff on Thursday, April 27, 2017. The investigator asked Plaintiff if he would be amenable to a transfer to another work location, and Plaintiff said that he would. The investigator told Plaintiff someone would call him back when the investigation was completed.

52. Plaintiff returned from vacation on Friday, May 5, 2017, and he called HR again. The person who answered the phone in HR told Plaintiff that "the investigation was still ongoing" and that there was no additional information regarding Plaintiff's employment status.

53. Plaintiff called the scheduler, to notify her he had returned from vacation, and the scheduler said she had been told to take Plaintiff off the work schedule.

54. Plaintiff did not hear from anyone regarding the status of the Walgreen's investigation.

55. On May 19, 2017, Plaintiff received a call from a Walgreen's employee in the employee benefits section. The caller told Plaintiff that he must "exercise his options" regarding his company stock by 3 p.m. that day, because Plaintiff's employment with Walgreen's terminated on May 15, 2017. The caller said Plaintiff would lose his stock at midnight, if he had not acted by 3 p.m.

56. Plaintiff attempted to speak with someone in HR at Walgreen's to find out what was going on. He spoke with several different people, but none of them could provide any information, other than saying Plaintiff was "terminated."

57. Plaintiff left several voice mails for HR, demanding to know what the status of the investigation and his employment was, whether the investigation was concluded, and whether he had been fired or not.

58. Plaintiff telephoned and left a voice message for the new District Manager, Brian Burchell.

59. The District Manager called Plaintiff, but he told Plaintiff he was new in his position, had not been involved in any decisions related to Plaintiff's employment, and he told Plaintiff to "call HR."

60. When Plaintiff pressed Mr. Burchell as to whether he had been fired, Mr. Burchell said that he could only tell him that he was "terminated," and that Defendant would pay Plaintiff everything that was owed to him, such as unused vacation or PTO days.

61. When Plaintiff later reviewed his pay records for the April-May, 2017 period, he saw that he had been paid for a full day's work for April 21, 2017, although he had been told to leave early.

62. Plaintiff was also paid for his vacation days off, as was customary company policy.

63. However, rather than having significant Personal Time Off ("PTO") remaining, for which Defendant was obligated to pay him, Walgreen's had instead applied Plaintiff's PTO to the time during which he was "under investigation" and had been told not to come to work.

64. On May 19, 2017, Plaintiff also called Fidelity, the company which manages Defendant's employee stock plan.

65. Fidelity told Plaintiff its records did not show that Plaintiff's employment had been terminated, but showed that Plaintiff had "retired" as of May 15, 2017.

66. The Fidelity advisor told Plaintiff that he did not have to make any decision about his stock options for one year after "retirement."

67. Plaintiff contacted his personal financial advisor and told him of the conflicting information he had gotten from Walgreen's and Fidelity.

68. Plaintiff's personal financial advisor initiated a three-way call with Fidelity.

69. Fidelity again confirmed that Plaintiff was "still good, still coded in" the system and that Plaintiff had one year "after retirement" to make a decision about his stock.

70. Because there had been a recent stock market devaluation, the Fidelity advisor recommended waiting to make any investment decisions until the market had recovered.

71. Several days later, Plaintiff received a COBRA notice from Defendant, stating that he must make arrangements for continuation of his health insurance by May 31, 2017, at which time his group health benefits would end.

72. Walgreen's management was well aware of the medical issues Plaintiff faced, as he had discussed them with his scheduler and his supervisors in relation to his being late or absent from work on several occasions.

73. Plaintiff called the number on the COBRA notice from Walgreen's to make inquiry about what insurance was available to him.

74. The person with whom he spoke gave him several options regarding continuation of his group health insurance.

75. Then, the person with whom Plaintiff was speaking asked him why he was not taking advantage of the plan for Walgreen's retirees, as it was much more affordable than the COBRA options.

76. Upon Plaintiff's further inquiries, the person with whom he spoke about COBRA options confirmed that her system indicated Plaintiff had retired and that he qualified for the retiree benefits from Walgreen's.

77. Plaintiff was not scheduled to work at any Walgreen's location after April 21, 2017.

78. Plaintiff was not ever informed by anyone with Defendant that it had "completed its investigation."

79. Plaintiff never received a separation notice from Walgreen's.

80. Walgreen's either unlawfully fired Plaintiff or constructively discharged Plaintiff by forcing him "to retire."

81. Walgreen's acted unlawfully by refusing reasonable accommodation for Plaintiff's disability and penalized Plaintiff for his disabilities by either firing him or forcing Plaintiff to retire.

82. Walgreen's discriminated against Plaintiff because of his disability.

83. Defendant also discriminated against Plaintiff because of his age, as Plaintiff was in his late fifties, was capable of performing all the necessary duties of his employment (with occasional accommodations when necessary), and was replaced by a younger pharmacist without disabilities.

84. Plaintiff filed a charge of discrimination with the EEOC on September 8, 2017 and amended the charge on October 5, 2017.

85. The EEOC issued Plaintiff a Notice of Right to Sue dated May 11, 2018.

### IV. PLAINTIFF'S CLAIMS

#### Count One – Discrimination under the ADA and TDA

86. Paragraphs 1-85 are hereby incorporated by reference as if fully set forth herein.

87. Defendant terminated Plaintiff's employment because of his disabilities, in violation of 42 U.S.C. § 12101, *et seq.*, and Tennessee Code Ann. § 8-50-103, *et seq.*; or, alternatively, Defendant terminated Plaintiff's employment because Plaintiff was perceived as having a disability, in violation of the same statutory provisions.

88. Plaintiff was denied the reasonable accommodation of being allowed to be late on rare occasions due to medical complications related to his disabilities, and Defendant refused to engage in the requisite interactive process to discuss reasonable accommodations.

89. Defendant's failure to engage in the interactive process violates 42 U.S.C. §12101, *et seq.*

90. As a result of Defendant's unlawful actions, Plaintiff has lost and continues to lose his salary and benefits to which he should be entitled after a long, more than 25-year career with Walgreen's.

91. Plaintiff was also subjected by Defendant to humiliation, embarrassment and emotional harm as a result of Walgreen's unlawful actions.

## Count Two – Age Discrimination

92. Paragraphs 1-91 are hereby incorporated by reference as if set forth fully herein.

93. Defendant discriminated against Plaintiff and other Walgreen's employees over the age of 40, in violation of the THRA and the ADEA, as set forth in Tenn. Code Ann. § 4-21-101, *et seq.* and 29 U.S.C. § 621, *et seq.*, respectively.

## Count Three – Retaliation

94. Paragraphs 1-93 are hereby incorporated by reference as if set forth fully herein.

95. Defendant retaliated against Plaintiff and terminated Plaintiff's employment because Plaintiff engaged in activity protected by the TDA, ADA, THRA and the ADEA.

96. As a result of Defendant's unlawful actions and retaliation, Plaintiff has lost and continues to lose his salary and benefits to which he should be entitled after a long, more than 25-year career with Walgreen's.

97. Plaintiff has also suffered humiliation, embarrassment and emotional harm as a result of Defendant's unlawful actions and retaliation.

## V. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court for the following relief:

a. That the Court issue and cause to have served on Defendant process requiring Defendant to respond to the Complaint filed against it within the time prescribed by law;

b. That, after a hearing of this case, Plaintiff be awarded judgment for damages caused by Defendant's discrimination and unlawful actions;

c. That the Court order Defendant to re-employ Plaintiff at an equivalent job, with all the employee rights and benefits to which he was or would be entitled but for the discharge or forced retirement, without any harassment or further illegal conduct or condition imposed on Plaintiff;

d. That, alternatively to re-employment, the Court award front pay and benefits in lieu of reinstatement;

e. That Plaintiff be awarded compensatory damages, including damages for humiliation, embarrassment and emotional distress;

f. That Plaintiff be awarded pre-judgment interest;

g. That Plaintiff be awarded punitive damages in an amount sufficient to discourage further unlawful actions by Defendant;

h. That Plaintiff be award liquidated damages;

i. That Plaintiff be awarded attorney fees, including all associated fees and expenses;

j. That Plaintiff be award all other and further relief as the Court deems proper; and

k. Plaintiff hereby demands a jury to try all claims and issues triable by a jury.

Respectfully submitted,

GRANT, KONVALINKA & HARRISON, P.C.

By: /s/ Tonya Kennedy Cammon
    Tonya Kennedy Cammon, BPR No. 016213
    *Attorneys for Defendant*
    633 Chestnut Street, Suite 900
    Chattanooga, TN 37450-0900
    (423) 756-8400 t
    (423) 756-6518 f
    tcammon@gkhpc.com

E396\001\ple\Complaint.docx